Good morning, Your Honors. May it please the Court. I'm Brad Hoffman and I represent Siren. The reason that we're here today is for three issues. The first issue is that the district court erred when it found that Simth Bagley did not consent to jurisdiction in Nevada when it signed the nondisclosure agreement, which expressly states that it shall be enforceable in any laws in any other jurisdiction pursuant to the laws as set forth in the joint venture agreement. Additionally, the joint venture agreement in corporate law I just don't understand how that converts into a forum selection clause that impliedly consents to jurisdiction in Nevada. First, in regards to the language of the nondisclosure agreement, it was negotiated between both of the parties who were savvy business individuals in a business context. In addition to that, as it states, expressly states, is that it's enforceable in any other jurisdiction. A judgment that's entered saying that you breach the nondisclosure agreement is enforceable anywhere, which makes perfect sense. But that doesn't, to me, equate to consent to have the decision about whether there was a breach of the nondisclosure agreement tried in the State of Nevada. The agreement itself, the parties have been working together for a few years. And by the very ways that the parties were working together for this particular contract, because it was being carried out on the Navajo Nation. Smith-Bagley knew at the period of time when it entered into the agreement that SIRM was a Nevada entity which provided financing to do business on the Navajo Nation. So? Well, because they knew of that, they knew of the difficulty. At the period of time in which when Smith-Bagley entered into the agreement, it had been trying to do work on the Navajo Nation for about four to six years, which they had the lucrative contracts through the ETC in which to garner the monopoly income of about $500,000 per month. But it wasn't able to do that. It knew at the period of time when it entered into the agreement of the difficulty it was to enter into that type of an agreement to get the necessary funding to do the projects on the Navajo Nation. It sounds like Navajo Nation might have personal jurisdiction, but what's that got to do with Nevada? Well, the agreement itself, the joint venture agreement which was negotiated actually between all three parties were there when they first originally met and discussed the prospects of doing business on the Navajo Nation. In fact, there was correspondence which went back and forth between Smith-Bagley which was sent over to SIRM and expressly stated that the reason, excuse me, to do the business on the Navajo Nation was very lucrative and that they looked forward to being in partners with SIRM. So the looking at the agreement when it was formed is that all the parties knew at that period of time is that the difficulty that it had doing business on the Navajo Nation. Granted the facts over the agreement also incorporated the joint venture agreement by reference, expressly stated out the terms. In the Bremen case, it holds that in order for the contract to be part of it for the selection clause that the parties must reasonably understand what they're doing and it's not unjust or unfair. At the time when they entered into the agreement, they understood what they were doing when they signed the nondisclosure agreement. I want to make one thing clear here is that in regards to the facts in establishing the agreement is that at that period of time, they simply could have asked for a copy of the nondisclosure agreement as it pertains to the form selection clause. They did not ask. Under the holdings which this Court cited when it did its analysis in the Chan case, when it looked at the Burger King holding and it also looked at the Heller v. Way case in which that Court looked at the fact is that it looks like it's a choice of laws provision. And in that case, they stated that even though that the clause itself lists out that it is a choice of laws provision, that when it contains a venue selection clause that it shall be enforceable and the parties can contract to waive the form of the from which there would be pulled into. We believe that the standard which the Court looks at is a de novo review. And it applies in regards to this case because the facts which are provided clearly show that at the period of time when they entered into the agreement, they knew that Siren was a Nevada entity and that any disputes would be brought into Nevada. In addition at that period of time is that when they breached that agreement, they knew that any types of remedies would be set forth which would be done in Nevada. The Second Circuit in the Ronan case, in the Ronan v. Local 94, states that parties can be held to a contract even if they know that they're not part of the formation of that contract. Here, similarly, is that Smith-Bagley was not a party to the contract when they entered into the agreement of the joint venture agreement to be held to the form selection clause inside the agreement. We believe that it has two basises in which they consented to jurisdiction and waived jurisdiction when they entered into the nondisclosure agreement, which is incorporated by reference. In addition to that, we believe that the district court erred when it found that it entered into the agreement and it breached the agreement. It breached the nondisclosure agreement. Under the cases of Hayden, Metropolitan, Panavision, it's not necessary that a party be in the state in which form is requested. In addition to that is that they knew when they entered into the agreement that Nevada is the state in which Siren is a party and that's where Siren is from. Mr. Hoffman, help me understand something. You started out in the state court in Nevada. Right. And then you got moved into the Federal court in Nevada. And you all seem to be more interested in litigating what court you're in than you are interested in litigating the merits of the case. Why is that so significant to your client that you want to be up on the court of appeals over whether you should be in Nevada or, I assume, Arizona would not raise any of these issues? What is the issue? Well, it's very significant. Actually, it goes to the heart of the agreement. It's because in the event that the agreement that Nevada is not the forum and it's brought in Arizona, it makes the effect of the joint venture agreement. The three parties work together on the Navajo Nation in which Indigitech agreed to the forum selection clause to be Nevada. Now, because they removed the case to the Federal court and the Federal court dismissed it, now it leaves us with a problem because the agreement was expressly negotiated to be done in Nevada. And now that this case has been dismissed in Nevada, it creates a problem because the Indigitech must be pursuant to the joint venture agreement as contemplated by the parties and negotiated. It is in Nevada. So now it creates a problem because we have two different jurisdictions. Effectively, it dilutes the joint venture agreement in the event that it's all not heard in one jurisdiction in Nevada. Help me with that. If you were in the Federal district court in Arizona, you're saying what would happen? Well, half of the case would already be heard in Nevada because Indigitech has held to the joint venture agreement, the forum selection clause in Nevada. And now if we have another case which was done in Arizona, it's going to be separate and distinct of the action which they've already agreed to be done in Nevada. Indigitech has already agreed to be litigated against in Nevada. So we're saying that in the event that they would bring another action in Arizona, there would be two separate actions. Okay. Your action here is for breach of the nondisclosure agreement. Yes, Your Honor. It also is a – we've also brought in the conspiracy against Smith Bagley, interference in contractual relations, and several other causes of action, other tortious claims. Okay. All stemming from an alleged breach of the nondisclosure agreement. Yes, Your Honor. Okay. So what is the alleged breach? The alleged breach is that they kept the information which they specifically negotiated for the proprietary and confidential information of the methods to do business on the Navajo Nation with the Navajo entity which is sovereign to the laws of the Navajo Nation. On the Navajo Nation, of course, well, where is that? Well, yeah. So what's – what breaches the nondisclosure agreement by that? That's what they negotiated to get, is the information. That's correct. And they breached that, the nondisclosure provisions, that after the nondisclosure agreement was entered into, they took one of the key employees of SIREN – excuse me, of Indigitech. Yeah. And now that person had worked for Smith Bagley for a period of time, and now they've taken away the ability through Indigitech, SIREN, in which to recover the monies which was spent for the seed money. So what does that have to do with the nondisclosure agreement? The information which they took out of the nondisclosure agreement, they were violating the nondisclosure agreement by using the confidential and proprietary information which was contained inside the nondisclosure agreement. How are they – what do you mean they're using it? They're getting around the obligations which they have inside the nondisclosure agreement. Smith Bagley originally went to SIREN and Indigitech in which to acquire the necessary know-how, knowledge, and seed funding in which to acquire the necessary permits, licenses, and rights of way to establish a cellular network on the Navajo Nation. They were unable to do so for a period of six to eight years, and now they're able to receive the revenue. The information which was contained inside the joint venture agreement was the agreement between Smith Bagley – excuse me, between Indigitech and SIREN to give them the necessary funding in which to go out and acquire the necessary permits, leases in which to establish the network that Smith Bagley was unable to do for a period, a long period of time. Okay. See, I mean, the whole point is you're trying to make this all into one great big ball of wax, and the only part of this that matters to this piece of litigation is the nondisclosure agreement and what it provides. Now, no doubt it could have provided for forum selection in Nevada. It didn't in terms. So you've got to somehow get it beyond its terms to say that that Smith Bagley consents to jurisdiction in the State of Nevada. Well, we believe that the expressed language of the first on the face of the nondisclosure agreement, which both of the parties recognized when they signed it, expressly states that it's enforceable in any other jurisdiction pursuant to the laws as set forth in the joint venture agreement. Exactly what does that mean? This agreement, Jump, shall be enforceable in any other jurisdiction without bond. What do you say that means? We believe that that's read together with the language which is right before that, which states that it's set forth in the laws pursuant to the joint venture agreement. They don't have any idea what's in the joint venture agreement at that point, right? That's correct. So you're asking them to sign something that they don't even know what's in it? Your Honor, what they could have done at that period of time is they simply could have asked for any of the information which was contained in the nondisclosure agreement. I thought you were saying you're not getting anything until you sign this nondisclosure agreement. No. What they could have done at that period of time is say, what do you mean? What are the laws set forth in the joint venture agreement? Correct. They could have asked for that. In addition to that, is that after they asked for that or, excuse me, after they received that agreement or that information, they could have objected to that phrase, objected to the laws that are set forth inside the joint venture agreement. If I read something that says I'm going to be subject to the laws that are set forth in another agreement, I'm not going to be thinking forum selection. I'm going to be thinking choice of law. Okay, whatever it is, I'm going to be subjected to it, whether it's Nevada, whether it's Alaska, whatever. I can deal with that. But it doesn't say where I can be sued. And you wrote the agreement, didn't you? Well, it was negotiated between Smith Bagley, Siren Inn, and Digitech. So the agreement itself, yes, it specifically provides for all the information which says the two clauses must be read together. Pursuant to the laws that are set forth in the joint venture agreement, enforceable in Nevada. Enforceable, yes, Your Honor, and enforceable in any other jurisdiction without bond. So reading those two clauses together, which period of time they could have objected to it, which they, after receiving the information, in fact, to this day. I, the way I, the most logical reading to me is, of that, is that, you know, if you breach the nondisclosure agreement, I still don't understand how they could have breached it on what you've told me. But assuming that they could have breached it, that if they did breach it, you could keep them from making a disclosure anyplace in the country. You didn't have to post 500 bucks in order to get an injunction stopping them from disclosing information that was confidentially transmitted to them pursuant to the agreement. They originally entered into the agreement because of the difficulty it was in which for Smith Bagley to do business on the Navajo Nation. And so working with Siren, which gave them the ability to actually do what they wanted to do. I get all that. And that's how it worked together with the information in the joint venture agreement. After they received the information in the joint venture agreement, they did not object to it. They never did. Roberts. You said that three or four times. What is without bond add or supposed to mean? Without bond. I believe the provision was inserted in there. So to avoid the fact to go into any different courts and then post a sufficient bond, which would be determined by that jurisdiction. Different jurisdictions would have different amounts of bonds. But you don't post a bond to sue somebody for breach of a nondisclosure agreement. You post a bond to get a judgment enforced. Don't you? For an injunction or a temporary restraint. In order to get an injunction, you have to post some type of a bond. And that's what this, you know, without bond, leaps right off the page at me. It's pretty much the same thing that Judge Rimer is saying. That's not a form selection clause. It says you can go in and get an injunction or a temporary restraining order for breaching this nondisclosure agreement without having to post one of these bonds. The key word is enforceable. Right. Yes, Your Honor. And enforceable in any other jurisdiction. Enforceable doesn't give you a forum. Enforceable gives you a remedy. But read together, in addition to that, it does predispose that there is a jurisdiction that is first enforceable in, stating that it is enforceable in another jurisdiction. Sure. Wherever you can grab hold of Smith-Bagley. Well, in addition to that, it has the joint venture agreement, which is attached and it's incorporated by reference, which specifically includes the clause. Enforceable without bond doesn't sound to me like a forum selection clause, whether you read it with the first part of that sentence or not. Well, the parties, when they're working together because of the difficulty and they knew of the knowledge of the difficulty in which to do business on the Navajo Nation, the parties were both savvy business individuals. But the parties had no idea what was in the joint venture agreement. Smith-Bagley didn't. Right? They asked for it. You said you can't have any of it until you sign this case. No, that did not occur. If they would have wanted that provision in regards to any information which was in the confidential proprietary information, that would have been provided. Did they ask for the joint venture agreement? No, Your Honor. Never? Not until after they signed the nondisclosure agreement. Well, I'm prepared to say that they had it in their hand. What would that add to the equation? I mean, if I've got the joint venture agreement in my hand, what am I going to take away from it except that the laws of the State of Nevada control? And that's nobody's questioning that. I just want to reserve a little time on rebuttal. I want to answer the question. Is that once they received the information, is that they could have objected to the information which was contained in there? They didn't object to the information. Well, why should they object to Nevada's laws controlling? They don't care about that. They care about where they can be sued. And in the joint venture agreement, it expressly states, similar to the Heller case, which this Court looked at in the Tan case, that a form selection, excuse me, that a choice of law clause which contains a form selection clause is enforceable. Wait a minute. Let me be sure I understand what you're saying, because I thought the whole point of the nondisclosure agreement was so that they could get access to the joint venture agreement. Isn't that what they wanted to see? Yes, Your Honor. And so you're saying they could have seen it before signing the nondisclosure agreement if they'd wanted to. That doesn't make any sense. What, Your Honor, I'm saying is that they could have received any of the information which was contained inside the joint venture agreement which was not confidential or proprietary. Any information in regards to the venue selection clause, the choice of laws clause, would have been provided. Thank you, Your Honor. Thank you. I'll save your remaining time. Mr. Alston. Thank you, Police Court and Mr. Hoffman. I'm Gerald Alston. I represent Smith-Bagley. If I may, I'd like to address first the parties, and the parties are Smith-Bagley, which is a – it does business – it's an Arizona corporation. It does business as Cellular One Northeast Arizona. And it's authorized by its license with Cellular One to do business in Navajo and Apache County in Arizona and in three counties in New Mexico, which principally involves the Navajo Nation and some parts of the Apache Nation. They direct their activities and services to providing, pursuant to certain federal programs, cell phone service on the remote areas upon these Indian reservations. Siren Gaming is a Nevada limited liability company that's authorized to do business in Nevada and on the Navajo Reservation. Indigitech is a company that was put together. It was a wholly Indian-owned company authorized to do business on the Navajo Reservation, and the principals in Indigitech, four individuals, were members of and residents of the Navajo Nation. The agreements that we're concerned with in the relationships are Smith-Bagley entered into a joint venture – pardon me – entered into a master lease agreement with Indigitech, and that agreement had a form selection provision, and the form selected for the resolution of disputes under the master lease agreement was the Navajo Nation. The reason for this agreement was to allow the Navajo-owned entity to deal with the Navajo Tribal Council to secure easements on mountaintops in remote areas on the Navajo Nation where microwave towers would be built. The agreement, in essence, provided that Smith-Bagley would pay all of the expenses incurred by these four individuals pursuing the interests of Indigitech, their expenses and tribal expenses in dealing with the Navajo Nation, and would pay in its entirety for the construction of the microwave towers. When they were completed, the ownership of the towers would be conveyed to Indigitech, where they would then rent space to Cellular One Northeastern Arizona and other people that might want to rent space on those towers. Cellular One would receive a rent abatement until they got their money back that they had spent for that, and then going forward they would pay rent to Indigitech. It was a good deal for Indigitech, a good deal for the Nation, a good deal for Cellular One had it worked. Indigitech, for reasons that have never become known to us because we've had no discovery, because they had no need of money, Cellular One was provided the money, Indigitech entered into a joint venture agreement with Siren Gaming, wherein they, in essence, agreed to sell a half of their income stream to Siren. Siren would loan them $750,000 for reasons that are not clear to at least us, and the individual members of Indigitech would guarantee that loan, and as revenue came in from when it began to come in from Cellular One and other tenants on the towers, they would pay back the loan and thereafter split the information 50-50. That was the agreement between Indigitech and Siren. Cellular One became concerned as they heard about it. Was there an arrangement with Siren to enhance the development of the towers? Supposedly so, but it's not clear to me what the money was needed for because Cellular One had the obligation to pay for the development of the towers. That agreement was entered on January 7, 2002, the joint venture agreement. The third and final agreement, and I guess the one we're here about today, was a nondisclosure agreement. The nondisclosure agreement, Cellular One became concerned as to what the terms and conditions of the joint venture agreement was because we didn't want to be in a position where we found to our horror and chagrin that one of our competitors owned this tower that we were going to be a tenant on, Nextel or Altel or Singular or something like that, and that's really what we wanted to know. Who is it that really is your partner in this joint venture? If you look at the joint venture agreement, and I don't think you need to, but if you did, forgive the Arizona language, there ain't no secrets in there. There's no secret methods or formulas for dealing with the Indian nation. The confidentiality was concerned with, on their part, the sensitivity was that people on the Navajo Reservation not know that the income stream to this Native American entity had been conveyed, half of it had been conveyed to a non-Indian entity. So those are the three agreements. The law is, as cited in both briefs, is something that we're comfortable with. I don't think there's really a major difference. I don't think they argue the law any differently than we do. They just see things differently than we do. I'm not going to, unless you believe I need to do so, I'm not going to dwell on whether the nondisclosure agreement carries from the joint venture agreement into itself a forum selection clause based on the questioning. Unless you have questions for me, I won't dwell on that. Our position is simply it does not. We believed it would be, didn't think about it that much, to be honest with you, but we believed it to be a choice of law agreement that we were going to agree that that nondisclosure agreement would be bound by whatever laws would control the joint venture agreement. How did you read this agreement shall be enforceable in any other jurisdiction without bond? Well, I didn't read it, but I didn't see that. I came in after the fact. But the way my client, right, the way my clients read it was just that, if they were going to go shooting their mouth off about the relationship with Indigitec and Siren, that they could be enjoined from doing that. The idea being that such an injunction, in my mind, such an injunction would indeed be sought in Arizona. I would question the Nevada Superior Court's interest in joining Arizona Corporation to not do things in Arizona. And so I would guess you would go to Arizona and get a judgment and get a temporary restraining order post a bond, and they would be enjoined in Arizona from doing that. And if they continued to breach their requirements under the nondisclosure agreement, I suppose they would be reliable for whatever damages were suffered by the parties to the nondisclosure agreement. Kind of in summing up, in order to meet, kind of semi after the fact, but in order to meet their burden of making a prima facie showing of Nevada jurisdiction, their primary thrust, as it was here today, was this nondisclosure agreement having by reference the Foreign Selection Clause. But the other things that came up in the course of the thing was, in course of this, was that they said that there were other things, activities on the part of Smith-Bagley, that would give rise to, on the one hand, general jurisdiction in Nevada, or on the other hand, specific jurisdiction in Nevada. And the things they cited for that, and the reason why I touch upon that is because this is a denoble look at what went on. And if they, their burden at Judge Proh's court was to make a prima facie showing of jurisdiction. And if they did that, then Judge Proh should not have done what he did. He should have had a hearing. But what about specific jurisdiction on the 17th claim, tortious interference with a contract? That would seem that that was aimed at the jurisdiction. So why doesn't that make a prima facie case of specific jurisdiction? That, Your Honor, is an allegation in the second amended complaint. But allegations in the complaint are not evidence. I can list for you everything that they say gave rise to a general jurisdiction and specific jurisdiction. General jurisdiction was the following. There was included an affidavit of Mr. Radcliffe, a person employed by SIREN, an allegation that somewhere, somehow, first of all, there was a suggestion that there had been a visit by SOLE onto Nevada, but then they rethought that. And there was an allegation in a corrected, a ROTA-corrected affidavit that said there were a phone call or phone calls between somebody in Arizona and SIREN in Nevada, didn't say when, didn't say who, didn't say who initiated the calls, where they talked about this activity in Navajo Nation. That's one. Number two, there was a March 15, 2002, e-mail from CEL1 to Indigitech and to SIREN wherein the principal in CEL1 says, we do intend to go ahead with this development of this network on the Navajo Nation, and we're excited about it and look forward to doing that. That was an e-mail. Number three, there was an e-mail in, let's see if I can find the date here, somewhat later than that, I'm going to say maybe October of 2002, I can find in my notes, but there was another e-mail from CEL1 to somebody at SIREN saying, in essence, complaining about the performance of the Indigitech people or lack thereof. And so that was the third contact. They claim that they point to two websites that CEL1 has. One is just a general website listing all mountain wireless service providers, and the other is CEL1's website, which is not, it's a passive, it's not an interactive website, and it's primarily, if you look at it, and this is all in the record, I can give you sites for the record if you need them, but it's because you have it before you. But if you look at that, it is primarily directed to Native Americans living on the reservation. In fact, there's things like stick your tongue out at the city folks, have a, you can get a $20 a month cell phone, things like that. So that's it. Oh, and one final one, as they say, and this is much like the, it's much like the, let's see, I'll get you the name of the case, the Westfall v. Mace case. They say that, which is the lady that gets hurt on the parking lot in the Nevada gambling place and tries to bring me into the accident in Arizona saying a lot of Arizona people go to Nevada and gamble. They say that because you can, people who subscribe to CEL1 phones can use those phones in Nevada or can call people in Nevada or while in Nevada can make phone calls, that that should give rise to general jurisdiction. Well, that's it. I've given you the total universe of the contacts. CEL1 does not own property in Nevada, does not have an office in Nevada, does not have, does not have employees in Nevada. How and where was the nondisclosure agreement done? I am, I don't know that. I'm confident it was signed in Arizona because CEL1 people have not ever been to Nevada relative, they've been to Nevada for a party, but they've never been to Nevada relative to this business dealing with siren. So I would, I'm reluctant to represent to you that it was signed on the Navajo Indian reservation, but it's my belief that it was. So anyway, you know, all the cases say that you have to, if you're going to specifically target a plaintiff in another state with your activities, and that would be, you can have specific jurisdiction, and that's when Shirley Jones sued the National Enquirer. They publish in New York, she's in California, and they said it was targeted on Shirley Jones and it hurt her in California. And same way with the fellow that had Motown, Gordy I think his name was, same thing, a scandal sheet targeted at Gordy in another state. We don't have that here. We've targeted nothing at siren in Nevada. We've done nothing with siren in Nevada. And that would be a specific jurisdiction. General jurisdiction is a pretty high bar. You have to show that your conducts directed to that state were continuous and systematic and you were something other than, you were availing yourself of business activities and opportunities in that state which would give rise to your responsibility to comply with the laws and submit to the jurisdiction of the state. I take it Smith-Bagley's activities in the geographic limits of Nevada were with the Navajo Nation. There is no Navajo Nation in Nevada. The Navajo Nation doesn't extend in Nevada. The Navajo Nation is separate and apart, but Navajo Nation is in part in Arizona and part in New Mexico. That's why we have two counties in Arizona and three counties in the Navajo Nation. Smith-Bagley's never touched Nevada with any kind of a length of pole, ten foot or otherwise. So they have not met the forum selection clauses are good and enforceable. We don't have one in this case. We do not have the facts that give rise even to a prima facie case of general jurisdiction, the continuous activities in the forum state, nor do we have anything that would give rise to specific jurisdiction. Back to specific jurisdiction. Yes. Reading this complaint, it alleges all kinds of acts and calls them a civil conspiracy intended to destroy the contract to which the fruits ought to have been available to the other party in the state of Nevada. Why isn't that allegation enough? Well, they have to. You cannot look at the allegations of a complaint and support. When the complaint, when the jurisdiction is called into question, you can't look at the allegations of the complaint. That's when they have the burden of coming forward and making separate or part of the complaint specific allegations to establish a prima facie entitlement to jurisdiction in the forum state. And that's why the only thing they did, they looked for contractual jurisdiction by the claim of the forum selection provisions being swept into the nondisclosure agreement. And then they pointed to, and I'm talking about what they showed Judge Pro. They pointed to the two e-mails I told you about. They talked about the telephone call. They talked about the Web sites. And they talked about the fact that if you had a cell on northeastern Arizona phone in Nevada, you can make a phone call. But they gave no evidence whatsoever of any acts directed at SIREN. See, if we did anything wrong, we breached the nondisclosure agreement in Arizona. I don't think we did. But if we did anything vis-a-vis Indigitech, we breached the master labor agreement with Indigitech. We didn't do that. What really happened here is this, and I'll sit down. Indigitech quit performing after they got the $750,000 from SIREN. We were hurt badly. SIREN was hurt badly because they didn't get their money back. SIREN filed a lawsuit first just naming Indigitech and the four or five individuals. Didn't sue us. Didn't serve them. Then they amended the complaint. You notice this is the First Amendment. They amended the complaint, named us, and there's only two allegations in the complaint that would even suggest we knew anything about them in Nevada. They named us, served us, and we're off and running. It's got an ex parte temporary restraining order from the Nevada Superior Court, the state-level court, enjoining us from operating our easements and receiving our federal funding. We took care of that. Are these towers already up? They are now. Indigitech never performed. This would have been such a wonderful deal for everybody if they had done it, but we had to go in. You heard Mr. Hoffman talk about hiring an employee. We hired an employee after Indigitech kind of disappeared. We hired an employee who had worked for Indigitech and other people and began to approach the tribe again to get these easements. They refer to them as easements to use this stuff. And unfortunately, our deal with Indigitech was we'll get rent abatement until we get back the money we paid to build these towers. But after Indigitech left, our deal with the Navajo Nation became you build the towers and you pay the rent. So we were hurt badly, too. So that's what's happened. I mean, to my knowledge, they never have served anybody with Indigitech. They admitted a complaint, served us, and we're off and running. Unless you have questions, I'll sit down. It sounds like Indigitech sold the same horse twice and went south with the money. It breaks our heart to think that. May I sit down? Thank you, Mr. Hoffman. Mr. Hoffman. No, they received the benefits of the bargain. They don't want to be held to the provisions of the contract. They're receiving the benefits. They're transmitting on the Navajo Nation, which they otherwise would not have been able to do if it had not been for SIRN and Indigitech. It's not a broken horse. They went and they got what they wanted to get. They've got the ETC status, which is very lucrative, through the 1996 Clinton Act, which allows them to receive an incredible monopoly to the tune of about $500,000 per month on the revenue, which is generated through the work that Indigitech and SIRN did together. Your side turned over close to a million dollars to Indigitech and got nothing in return? Well, what they had in return for that is that they were supposed to have the ownership and part of the lease agreements, which Smith-Bagley was to turn over to the joint venture, which they never did. But Indigitech, you got nothing back from Indigitech. We got nothing back from Indigitech, but we don't have anything back from Smith-Bagley, which they promised. Why don't you have anything back from Indigitech? Well, after they entered into the nondisclosure agreement, one of their key personnel went to work for Smith-Bagley after they received the information. Are you suing Indigitech? Yes, we are, Your Honor. Where? In Nevada, pursuant to the joint venture agreement. And the status of that? I believe that they're in default status right now. There's one problem with service on Indigitech, and I believe that they're in default right now. I wanted to point to a couple of things, is that the e-mail which was written by Smith-Bagley to Siren, dated March 15, 2002, says, Exhibit 93, Our ETC status is well known and established and will grow. Please continue to support the project, as we have, and you will not be sorry. The effects were felt in Nevada. In addition to that, I'm sure you're all familiar with that exchange. So if you just want to sum up your point. My point is, is that they have specific jurisdiction in Nevada, is that when they purposely availed themselves to the laws in Nevada, when they entered into the joint venture agreement, they personally availed themselves. It's not required that they're actually present in Nevada through the holdings of Metropolitan, Brainerd, CyberCell, Calder, Panavision. In addition to that is that they also have general jurisdiction in Nevada. And the general jurisdiction, I just wanted to point out to the Court, is that the holding of the memo Dodge, which also is a little bit different in distinction here. I think I was pretty clear at the beginning of the session that when the time is up, it's up. Thank you, Your Honor. Thank you, counsel, for your argument.  Thank you, Your Honor.
judges: Trott, Rymer, Plager